743 F.Supp. 245 (1990)
Gregory FENDERSON, James Summers, Carmelo Torre on Behalf of Themselves and All Others Similarly Situated, and Christian Campbell, Plaintiffs,
v.
INDEPENDENT FEDERATION OF FLIGHT ATTENDANTS ("IFFA"); Victoria Frankovich, Individually and as President of IFFA; Karen Lantz, Individually and as Vice President of IFFA; and William Hoffman, Individually and as Secretary-Treasurer of IFFA; and Trans World Airlines, Inc., Defendants.
No. 89 Civ. 1655 (LLS).
United States District Court, S.D. New York.
August 10, 1990.
*246 Seham, Klein & Zelman, New York City (C. Sue Barnett, of counsel), for plaintiffs.
Proskauer, Rose, Goetz & Mendelsohn, New York City (Murray Gartner, of counsel), for defendant TWA.
Jolley, Walsh, Hager & Gordon, Kansas City, Mo. (Stephen Douglas Bonney, of counsel), for defendants IFFA, Frankovich, Lantz and Hoffman.

OPINION AND ORDER
STANTON, District Judge.
Plaintiffs Gregory Fenderson, James Summers and Carmelo Torre are flight attendants employed by defendant Trans World Airlines ("TWA"). They move for partial summary judgment, seeking a determination that defendants have violated section 2, Eleventh (a) of the Railway Labor Act (the "RLA"), 45 U.S.C. § 152, Eleventh (a) (1982).

BACKGROUND
TWA and defendant the Independent Federation of Flight Attendants (the "IFFA" or "union") are parties to a collective bargaining agreement. That agreement contains a union security clause requiring that TWA flight attendants become members of the IFFA as a condition of continued employment.[1]
In March 1986, the IFFA went on strike against TWA, which then operated using flight attendants hired after the strike began ("new hires") and flight attendants who did not strike or returned to work during the strike ("crossovers"). In May 1986, TWA accepted the IFFA's unconditional offer to return to work. TWA retained the flight attendants it employed during the strike, recalling those that had remained on strike ("full-term strikers") on a seniority basis as vacancies occurred.
TWA recalled the last full-term strikers in 1989, and has since hired new flight attendants. In 1989, TWA hired approximately 300 new flight attendants, at least 39 of whom have joined the IFFA.
In September 1988, the IFFA amended its Constitution and Bylaws ("C & B") to add a twelve-month "education and orientation period" for those seeking admission or readmission to the union, during which the new member cannot run for office or vote in union elections, referendums or ratifications.[2] Other amendments raised the initiation fee from $100 to $250 and created a fee of $250 for those who resign the union and seek readmission.[3]

*247 DISCUSSION
Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c).
Plaintiffs Fenderson and Torre are new hires, and plaintiff Summers is a crossover who resigned from the union. They contend that the amendments to the C & B violate section 2, Eleventh (a) of the RLA, which states in pertinent part:
Notwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted
(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: Provided, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.
45 U.S.C. § 152, Eleventh (a). Plaintiffs assert that because of this violation, the IFFA cannot require them to pay dues as a condition of continued employment.
Plaintiffs contend in this action that the amendments were used to exclude them from participation in the union and to punish them for their activities during the strike. However, in this motion they contend that the amendments violate section 2, Eleventh (a) on their face and without reference to the motivations behind them. Thus, the basis for plaintiffs' motion is that even if the amendments had been passed in good faith for wholly legitimate reasons, they would violate the RLA.

1. The one-year education and orientation period
The education and orientation period creates a class of members in the IFFA from whom the right to vote is temporarily withheld: they therefore lack the ability to participate fully in important union decisions. For a year, the union requires those new TWA employees to pay it dues as a condition of continued employment while their membership rights are substantially less than those of other union members.
Section 2, Eleventh (a) prohibits unions from imposing such restrictions on membership while simultaneously demanding that all employees pay dues or face discharge from employment. A union that enforces a union security clause must, according to the statute, make membership available to such employees "upon the same terms and conditions as are generally applicable to any other member".
New IFFA members are precluded from voting on any union matter, no matter how critical or fundamental it may be to the organization to which they are required to pay dues. Thus, their membership is not upon the same terms and conditions as that generally available to other members, and *248 accordingly the union cannot enforce the union security agreement.
The IFFA asserts that this interpretation restricts its right to regulate its internal affairs, and that section 2, Eleventh (a) did not intend such restrictions.
However, section 2, Eleventh (a) does not impose any restrictions on union administration. It merely states that when a union enforces a union security agreement it must make membership available to all on the same terms and conditions. Thus, the statute gives the IFFA a choice: make membership available to all on the same terms and conditions and enjoy the benefit of the financial support of all employees under the union security clause, or exercise the right to restrict certain classifications of members' rights and forego the right to compel contributions from the disenfranchised employees.
The legislative history of section 2, Eleventh (a) supports this conclusion. In 1950, George M. Harrison, a union president, spoke on behalf of the Railway Labor Executives' Association in support of the provision, which for the first time permitted union security clauses in agreements covered by the RLA:
It is our understanding that the present bill will protect those employees who, because of restrictions which may exist in the constitutions of some unions, may not be eligible to membership or be eligible to membership only on a limited basis.
The bill provides ... that no union shop agreement may be made which requires union membership as a condition of employment `with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member.' Thus, if a union refuses to accept the membership of persons of certain classes, or offers them only limited membership, it cannot, with respect to such persons, require union membership as a condition of employment in any agreement with a carrier.
Railway Labor Act Amendments: Hearings on H.R. 7789 Before the Comm. on Interstate and Foreign Commerce, 81 Cong.2d Sess. 13 (1950), reprinted in 3 The Railway Labor Act of 1926, A Legislative History (M. Campbell & E. Brewer, III eds. 1988).
Thus, the legislative history shows Congress intended to prevent unions that enforced security agreements from giving some members only limited membership rights. The unions who supported the provision informed Congress that they understood it would limit their power to compel dues payments from those to whom they offered less than full membership rights.
The IFFA asserts that section 2, Eleventh (a) was intended only to protect employees from discharge and to prevent unions from discriminating on the basis of race. See International Ass'n of Machinists v. Street, 367 U.S. 740, 765, 81 S.Ct. 1784, 1798, 6 L.Ed.2d 1141 (1961) (primary purpose of requirement that membership be available on same terms and conditions was to prevent discharge where unions denied membership on racial grounds).
However, the statute is not so narrow. Nothing in section 2, Eleventh (a) states or otherwise implies that it is limited to protection against discharge or racial discrimination. IFFA asserts that section 2, Eleventh (a) cannot be interpreted purely literally. See Brady v. Trans World Airlines, Inc., 174 F.Supp. 360, 364 (D.Del.1959) (that section "not unlike other provisions of the Railway Labor Act is incapable of literal application." (footnote omitted)). However, departing from the terms of the statute here would not avoid an illogical result, as in Brady. See id at 364-65. Instead, interpreting the statute according to its terms would be true to its purpose of preventing unions from discriminating against members while requiring them to pay dues as a condition of employment.
Moreover, the legislative history of the statute argues against that restrictive interpretation. Mr. Harrison stated that unions would be prohibited from discriminating against members, such as communists, because of their beliefs while requiring them to pay union dues as a condition of *249 employment. Railway Labor Act Amendment Hearings at 24.
Accordingly, plaintiffs are granted summary judgment that the one-year education and orientation period violates section 2, Eleventh (a) of the RLA.

2. The $250 fee
Plaintiffs argue that only the resigned crossovers are subject to the $250 initiation and reinstatement fee, and therefore the fee denies them membership upon the same terms and conditions as are generally applicable to other members. Yet the fee applies to all those who wish to join or rejoin the union, and the IFFA has applied it to new employees TWA has hired since the last full-term strikers were recalled. Therefore, the fee is generally applicable.
Plaintiffs also contend that the fee violates section 2, Eleventh (a) because failure to pay it denies membership for a reason "other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership." 45 U.S.C. § 152, Eleventh (a).
Plaintiffs contend that "initiation fees" in section 2, Eleventh (a) does not encompass reinstatement fees, although that same term in section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1988), includes reinstatement fees. See NLRB v. Kaiser Steel Corp., 506 F.2d 1057, 1060 (9th Cir.1974); NLRB v. International Union of Operating Eng'rs, Local No. 139, 425 F.2d 17, 19 (7th Cir.1970); L.A. Water Treatment, Div. of Chromalloy American Corp., 286 N.L.R.B. 868, 880 n. 13 (1987).
Plaintiffs argue that the legislative history of the RLA shows Congress intended to restrict the union fees permitted under that statute to initiation fees. See Street, 367 U.S. at 766, 81 S.Ct. at 1798 (proposed section 2, Eleventh (a) was clarified to state that "fees" means "initiation fees").
However, neither the RLA nor its legislative history show that "initiation fees" exclude reinstatement fees, and the identical term in section 8(a)(3) permits such fees. Sections 8(a)(3) and 2, Eleventh (a) "are in all material respects identical." Communications Workers of America v. Beck, 487 U.S. 735, 108 S.Ct. 2641, 2648, 101 L.Ed.2d 634 (1988) (footnote omitted). Accordingly, the term "initiation fees" in section 2, Eleventh (a) encompasses reinstatement fees.
Plaintiffs argue that the $250 fee is not "uniformly required" since it applies only to the resigned crossovers as they are the only members who have resigned. Moreover, they assert that only the resigned crossovers must pay both initiation and reinstatement fees, and the reinstatement fee is not uniform because it does not apply to those who lose their membership for reasons other than their resignation.
All members who resign and seek readmission to the IFFA must pay the fee. That fee satisfies the uniformity requirement so long as it is based on reasonable classifications, rather than discriminatorily imposed. See Bagnall v. Air Line Pilots Ass'n, Int'l, 626 F.2d 336, 339-40 (4th Cir. 1980) (quoting Aluminum Workers Trade Council, 185 N.L.R.B. 69, 70 (1970), in turn citing Stage Employees & Motion Pictures Operators Union, 140 N.L.R.B. 759 (1962)).
The $250 fee is, on its face, nondiscriminatory. It does not distinguish between classes of members, but applies equally to all who seek membership. Accordingly, summary judgment in plaintiffs' favor on their claim that the fee violates section 2, Eleventh (a) is denied.

CONCLUSION
Plaintiffs' motion for summary judgment on their claim that the eligibility and orientation period violates section 2, Eleventh (a) is granted. Their motion for summary judgment that the $250 initiation and reinstatement fees violate that section is denied.
NOTES
[1] Article 24(A) of the collective bargaining agreement states in pertinent part:

(a) Each employee now or hereafter employed in any classification covered by this Agreement shall, as a condition of continued employment in such work, within sixty (60) days following the date such employee enters training become a member of, and thereafter maintain membership in good standing (as herein defined), in the Union, except as provided otherwise herein. Such conditions shall not apply with respect to any employees to whom such membership is not available upon the same terms and conditions as are generally applicable to any other member of his classification, or with respect to any employee to whom membership is denied or terminated for any reason other than the failure of the employee to tender the dues uniformly required of other members of his/her classification as a condition of acquiring or retaining membership.
[2] "Any person seeking initial membership in or readmission to this Organization, as provided in Article II Section 2 of this Constitution and Bylaws, shall be required to serve a twelve (12) month Union education and orientation period in order to establish eligibility to seek and hold Union office or vote in official Union elections, referendums and ratifications. During such Union education and orientation period, such member shall be entitled to all other rights and privileges of Union membership." C & B Article II, § 6.
[3] "The initiation/readmission fee for this Organization shall be two hundred fifty ($250) dollars payable upon joining, but, for new hires in IFFA bargaining unit positions, no later than the sixtieth (60th) day from the date of such employment. All Flight Attendants who have previously paid an initiation fee to this Organization will be exempt from the payment of initiation fees. However, a member who has resigned membership from this Organization shall be required to pay a readmission fee to this Organization to reestablish membership. Failure to make timely initiation/readmission fee payment will result in the denial of membership in good standing." C & B Article XI, § 4.